IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| TRACY MARIE CLARKIN,<br><br>        Plaintiff,<br><br>    vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security<br>Administration,<br><br>        Defendant. | Civil No. 25-00239 MWJS-KJM<br><br>ORDER REVERSING DECISION OF THE<br>COMMISSIONER OF SOCIAL SECURITY<br>AND REMANDING FOR FURTHER<br>ADMINISTRATIVE PROCEEDINGS |

**INTRODUCTION**

After a long career as a loan officer, Tracy Clarkin applied for Social Security

disability and disability insurance benefits based on what she described as severe

symptoms from mental and physical impairments.  After a brief hearing, the ALJ found

that Clarkin's symptom statements were not consistent with the evidence in the record

and denied the applications.

Clarkin now appeals to this court.  Invoking well-established Ninth Circuit

precedent, she argues that the ALJ could not reject her symptom testimony without

"offering specific, clear and convincing reasons for doing so."  *Brown-Hunter v. Colvin*,

806 F.3d 487, 492-93 (9th Cir. 2015) (cleaned up).  She maintains that the ALJ's offerings

fell short of those demanding standards.

Clarkin's appeal is well taken.  The ALJ's decision is REVERSED, and this matter is REMANDED for further administrative proceedings.

## BACKGROUND

Under the relevant Social Security regulations, ALJs must follow "a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act."  *Keyser v. Comm'r of Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011).  These "steps"—really, questions that must be answered in proper order—are the following:

> (1) Is the claimant presently working in a substantially gainful activity?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25 (citing 20 C.F.R. § 404.1520).

In a written decision issued after a brief hearing, the ALJ worked through the first four of these steps in Clarkin's case.

***Step One.***  At step one, the ALJ found that Clarkin was not presently gainfully employed.  Dkt. No. 8-1, at PageID.48 (Administrative Record (AR) at 27).  Although Clarkin had worked as a loan officer since the early 2000s—both as an employee of companies and as an independent contractor—she stopped working in February 2022 because of a "group layoff" at her latest employer.  *Id.*  And the administrative record reflects that Clarkin did not resume work elsewhere, which she attributed to her severe

2

impairments and their symptoms.  *Id*. at PageID.293 (AR at 272) (Clarkin representing

that she "stop[ped] working" in February 2022 "[b]ecause of [her] condition(s)").

*Step Two.*  At step two, the ALJ agreed with Clarkin that she faced several severe

physical impairments.  *Id.* at PageID.48 (AR at 27).  But the ALJ did not credit Clarkin's

statements and hearing testimony that she also suffered from several mental

impairments.  The ALJ acknowledged that Clarkin had alleged difficulty in four areas

of mental functioning:  (1) "understanding, remembering, or applying information,"

(2) "interacting with others," (3) "concentrating, persisting, or maintaining pace," and

(4) "adapting or managing oneself."  *Id.* at PageID.49-50 (AR at 28-29).  The ALJ

nonetheless concluded that "considered singly and in combination," these mental

impairments "do not cause more than minimal limitation" in Clarkin's "ability to

perform basic mental work activities."  *Id.* at PageID.49 (AR at 28).

The ALJ offered three reasons for this conclusion.  First, the ALJ relied on

"mental status examinations"—more precisely, the observations Clarkin's psychiatrist,

Dr. John Guo, made of her during once-a-month teleconference appointments.  *Id.*; *see

generally id.* at PageID.79 (AR at 58) (ALJ noting that Clarkin was "going to" therapy

with Dr. Guo "once a month via Zoom").  During these appointments, Clarkin was

observed as "alert and oriented," and was perceived to be exhibiting "normal attention

and concentration, logical thought process, intact associations, normal memory, good

impulse control, and good judgment and insight," as well as displaying "normal and

cooperative behavior." *Id.* at PageID.49 (AR at 28).  The ALJ also noted Clarkin's self-report that she "gets along 'fine' with authority figures." *Id.*

Second, the ALJ reasoned that Clarkin's "mental symptoms were conservatively managed with psychotherapy and antidepressant medications," and that at least one aspect of her mental health "improved with treatment and support." *Id.* at PageID.50 (AR at 29).  The ALJ also observed that although Clarkin was "recommended for cognitive behavioral therapy and to find a therapist," the record "indicates she did not follow through with this recommendation." *Id.*

Third and finally, the ALJ found that Clarkin "reported intact activities of daily living"—which the ALJ noted would be explored in more detail later in her written decision—and found that these activities contradicted Clarkin's statements about the severity of her limitations.  *Id.* at PageID.49 (AR at 28).

*The Last Three Steps.*  At the third step, the ALJ found that Clarkin's impairments did not meet or exceed any listed impairment that would qualify her as disabled without regard to her age, education, and work experience.  *Id.* at PageID.55 (AR at 34).  For that reason, the ALJ assessed Clarkin's residual functional capacity, or "RFC," to aid in determining whether she could perform available work at steps four and five.

In making this assessment, the ALJ stated that she "has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* at PageID.51 (AR at 30).  The

ALJ further stated that she would begin by assessing "whether there is an[y] underlying medically determinable physical or mental impairment(s)" that "could reasonably be expected to produce the claimant's pain or other symptoms." *Id.*

As to mental impairments, the ALJ recognized that Clarkin had reported being "consistently unable to make mental connections or remember things," to "having fatigue that prevents her from getting out of bed," to "having intermittent chronic dizziness," and that "her brain fog creates enormous anxiety." *Id.* The ALJ also recognized that Clarkin had "testified that she struggles with memory, loss of train of thought, occasional dizziness, debilitating fatigue, and mental decline," and that Clarkin had "anxiety and panic attacks outside of her home." *Id.*

The ALJ did not doubt Clarkin's inability to work if this symptom testimony were credited. But the ALJ found that while Clarkin's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Clarkin's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at PageID.51-52 (AR at 30-31).

In the ALJ's view, Clarkin's "statements concerning the alleged intensity, persistence, and limiting effects of symptoms" were "inconsistent" with Clarkin's "activities of daily living." *Id.* at PageID.53 (AR at 32). As promised earlier in her decision, the ALJ provided the following description of these activities:

5

> The claimant reported that she is able to maintain personal care, prepare simple meals, perform basic household chores, laundry, dishes, and vacuuming, go outside two to three times per week, walk, drive a car, shop in stores, and eat out with friends . . . . Additionally, she testified to traveling during the relevant period:  she flew to Ohio twice in 2023 for the holidays with family, and to San Diego and Denver in 2024 by herself to meet a friend as well as to help a friend recover from knee surgery.

*Id.*  Although the ALJ noted that it was "not determinative of the ultimate issue," and acknowledged that "one need not be utterly incapacitated to be found disabled," the ALJ nonetheless reasoned that "some of the physical abilities required to perform these activities are the same as those necessary for obtaining and maintaining employment." *Id.*  As such, Clarkin's "ability to participate in such activities is inconsistent with the claimant's statements regarding the degree of her limitations."  *Id.*

The ALJ offered one final reason for rejecting Clarkin's symptom testimony:  "the evidence shows that the claimant stopped working for reasons not related to the allegedly disabling impairments."  *Id.*  According to the ALJ, Clarkin "stopped working due to a business-related group layoff rather than owing to impairment related reasons and reasons which are unrelated to her medical conditions, symptoms, and limitations." *Id.*  The ALJ did not cite any evidence in the administrative record to support that finding.

But having rejected Clarkin's symptom testimony, the ALJ adopted an RFC that led to the conclusion, at step four, that Clarkin could still perform past work as a loan

6

officer.  *Id.* at PageID.55 (AR at 34).  The ALJ therefore denied Clarkin's applications

without having to consider whether Clarkin could perform other work at step five.

Clarkin asked the Social Security Administration's Appeals Council to review the

ALJ's decision, but that request was denied, *id.* at PageID.22–27 (AR at 1–6), making the

ALJ's decision the Commissioner's final decision.  This timely appeal followed.

## STANDARD OF REVIEW

The Commissioner's disability determination must be reversed when "it is either

not supported by substantial evidence or is based upon legal error."  *Luther v. Berryhill*,

891 F.3d 872, 875 (9th Cir. 2018).  The standard is deferential, requiring "only such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022) (cleaned up).  But a court

may "review only the reasons provided by the ALJ in the disability determination and

may not affirm the ALJ on a ground upon which [they] did not rely."  *Orn v. Astrue*, 495

F.3d 625, 630 (9th Cir. 2007).  "Long-standing principles of administrative law require us

to review the ALJ's decision based on the reasoning and factual findings offered by the

ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have

been thinking."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009).

## DISCUSSION

When a claimant is not found to be malingering—that is, they are not

exaggerating feigning their condition—and when their impairments could reasonably

produce the symptoms they allege, an ALJ may "reject the claimant's testimony about the severity of [her] symptoms only by offering specific, clear and convincing reasons for doing so." *Brown-Hunter*, 806 F.3d at 492-93 (cleaned up); *see also Orn*, 495 F.3d at 635. To meet that standard, the ALJ's reasons "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" *Loniza v. King*, Civ. No. 23-00352, 2025 WL 435943, at *3 (D. Haw. Feb. 7, 2025) (quoting *Brown-Hunter*, 806 F.3d at 493 (cleaned up)).

In this case, the ALJ did not suggest Clarkin was malingering. And the ALJ acknowledged that Clarkin's impairments could reasonably be expected to produce the symptoms she reported. The only question, then, is whether the ALJ offered the specific, clear, and convincing reasons needed to reject Clarkin's symptom statements.

1. The ALJ's first offered reason for rejecting Clarkin's symptom statements is that her psychiatrist, Dr. Guo, had observed during once-a-month Zoom appointments that Clarkin was "alert and oriented," exhibited "normal attention, and concentration, logical thought process, intact associations, normal memory, good impulse control, and good judgment and insight," and showed "normal and cooperative behavior." Dkt. No. 8-1, at PageID.49 (AR at 28).

This reasoning is not persuasive, and, indeed, the Commissioner himself does not appear to defend it in his briefing. Dkt. No. 23, at PageID.977 & n.3 (discussing

Dr. Guo only in defending the ALJ's rejection of Dr. Guo's opinion that Clarkin was severely disabled, but not relying on Dr. Guo's telehealth observations as a basis for discounting Clarkin's symptom statements). The fact that Clarkin "still regularly had cogent moments—including in periodic appointments with medical professionals—does not obviously contradict her testimony" that she also regularly had bad days in which she could do nothing but lie in bed. *Jaco v. Dudek*, Case No. 24-00472, 2025 WL 1144764, at *6 (D. Haw. Apr. 18, 2025). "As the Ninth Circuit has cautioned, 'while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.'" *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)).

In short, the ALJ's reliance on Dr. Guo's observations during monthly telehealth appointments does not amount to a specific, clear, and convincing reason to reject Clarkin's symptom statements.

2. The ALJ's second offered reason concerned Clarkin's treatment records. The ALJ relied on these treatment records in three distinct ways, and the Commissioner argues that each of them suffices to warrant affirmance here. But the court concludes that none does.

a. The ALJ first relied on the fact that Clarkin's "mental symptoms" had been "conservatively managed with psychotherapy and antidepressant medications." Dkt.

No. 8-1, at PageID.50 (AR at 29). Conservative management or treatment can be an appropriate consideration in evaluating the credibility of symptom testimony.

But "to reject a claimant's symptom testimony based on conservative treatment, the record must contain evidence that a more aggressive, appropriate treatment was available." *Jaco*, 2025 WL 1144764, at *7 (citing *Loniza*, 2025 WL 435943, at *5); *see also Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010). The administrative record contains no evidence that more aggressive, appropriate treatment was available here.

To be sure, as Clarkin acknowledges, Dkt. No. 22, at PageID.957, one medical professional suggested the possibility of an inpatient psychiatric evaluation. But there is no evidence that any medical professional ever concluded that inpatient treatment was appropriate under the circumstances.

b. Next, the ALJ noted that at least one aspect of Clarkin's mental impairments had improved with treatment. And it is true, as the Commissioner argues, that "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability." Dkt. No. 23, at PageID.971 (quoting *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017)).

But the ALJ did not say—let alone offer reasons to conclude—that treatment improved Clarkin's mental symptoms to such an extent that they were no longer as severe as Clarkin had represented. Just as a person with a disability should not be "penalized for attempting to leave their lives in the face of their limitations," *Auapaau v.*

*O'Malley*, Civ. No. 24-00176, 2024 WL 4301378, at *3 (D. Haw. Sept. 26, 2024) (cleaned up), so should they not be penalized for attempting to improve their conditions.  Unless an improvement is significant enough to remove the disability, it does not change the fact that the person is disabled and thus entitled to benefits.

That is, indeed, precisely what the Ninth Circuit explained in the very case on which the Commissioner relies.  In *Wellington*, the Ninth Circuit recognized that "[s]ymptoms may wax and wane during the progression of a mental disorder," but that those symptoms "may also subside during treatment."  878 F.3d at 876.  And if treatment results "not only" in the "symptoms and signs" being "ameliorated," but also the individual "return[ing] to a level of function close to the level of function they had before they developed symptoms or signs of their mental disorders," then that improvement "can undermine a claim of disability."  *Id.*

In this case, the ALJ found, at most, that "symptoms and signs" were to some extent "ameliorated."  *Id.*  Apart from noting Clarkin's improvement, the ALJ said nothing about the extent or significance of the improvement—let alone offered reasoning to conclude the improvement was significant enough to meet *Wellington*'s standards.  And the administrative record contains no obvious reason why one should reach that conclusion here.

//

//

c. Lastly, the ALJ relied on the fact that while Clarkin was "recommended for cognitive behavioral therapy and to find a therapist," the record "indicates she did not follow through with this recommendation." Dkt. No. 8-1, at PageID.50 (AR at 29).

It is true that a "claimant's 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment' can undermine her allegations about the severity of an impairment." Dkt. No. 23, at PageID.974 (quoting *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989)). But Clarkin did offer an explanation here. As she testified: "I did try, on numerous occasions, to find another counselor, often at Dr. Gu[o]'s request, but I wasn't able to. I would call. I would call providers that were in my network, and they had indicated on the roster that they were taking new clients, and I had one of two things happen. Either they just never called back, or they weren't, in fact, taking new clients." Dkt. No. 8-1, at PageID.79 (AR at 58).

Of course, the ALJ was not required to credit this explanation or to accept it as adequate. But to reject it, the ALJ had to offer reasons. The ALJ did not do that. As such, it is only the ALJ's *rejection* of Clarkin's testimony that is, on the present record, "unexplained, or inadequately explained." *Fair*, 885 F.2d at 603-04.

3. This brings us to the third of the ALJ's reasons, which centered on Clarkin's activities of daily living. That is to say, the ALJ reasoned that because Clarkin could do certain things in her everyday life, she was not reliably describing the severity of her symptoms.

12

Whenever an ALJ relies on reasoning of this sort, it creates a risk that a

"'disability claimant[]'" will be "'penalized for attempting to lead' their 'lives in the face

of their limitations.'"  *Auapaau*, 2024 WL 4301378, at *3 (quoting *Reddick v. Chater*, 157

F.3d 715, 722 (9th Cir. 1998)).  *Id.*  As a safeguard against that risk, the Ninth Circuit has

barred ALJs from relying on activities of daily living unless one of the following is true:

(1) the activities "actually contradict the claimant's symptom testimony," or (2) the

activities "show that the claimant spends a substantial part of their day engaged in

pursuits that are transferrable to a work setting."  *Id.* (citing *Orn*, 495 F.3d at 639).

"Absent one of these grounds, a claimant's daily activities cannot fairly be said to

detract from a claimant's testimony about the effect of their disability."  *Id.*

The ALJ did not offer sufficient reasoning to make either showing.  To begin

with, the ALJ offered *no* reasoning to support the conclusion that any of Clarkin's

activities of daily living "show that the claimant spends a substantial part of their day

engaged in pursuits that are transferrable to a work setting."  *Id*.  To be sure, the ALJ

generally observed that "some of the physical abilities required to perform" Clarkin's

activities of daily living "are the same as those necessary for obtaining and maintaining

employment."  Dkt. No. 8-1, at PageID.53 (AR at 32).  But this otherwise-unexplained

observation falls short for three reasons.  First, the ALJ does not explain what "physical

abilities" are the ones that would be "necessary for obtaining and maintaining

employment."  *Id.*  Second, the ALJ does not explain how any of these "physical

abilities" would address the symptoms from mental impairments that Clarkin described. Third, and most importantly, the ALJ offered no reason to believe that Clarkin spends a "substantial part" of her day engaged in transferrable pursuits. Indeed, the ALJ did not even offer a view on how much time Clarkin spends on these activities of daily living on a typical day.

Nor does the record offer any support for the conclusion that Clarkin spends any substantial part of her day engaged in transferrable pursuits. For example, Clarkin reported being able to "maintain personal care, prepare simple meals, perform basic household chores like cleaning, laundry, dishes, and vacuuming." *Id.* But on the same form in which she reported those activities—Exhibit 8E—Clarkin wrote that dishes typically take her "5-10 min." and vacuuming "15 mins." *Id.* at PageID.337 (AR at 316). As for meals, Clarkin explained that because she prepares "[j]ust simple meals usually frozen," it only takes her "from 5 – 30 minutes." *Id.* And Clarkin did not represent that she did each of these activities every single day. *Id.* This record does not support the ALJ's conclusion that Clarkin performed these activities for a substantial part of her day.

As to the other activities of daily living, the record in fact shows that Clarkin *does not* perform them each day, but instead only performs them on rare occasion. Clarkin reported that she goes outside of her house only "two to three times per week," for example. *Id.* at PageID.53 (AR at 32); *see also id.* at PageID.338 (AR at 317) (Clarkin

14

reporting that she "tr[ies] to daily," but can only manage it "2-3 x a week").  Putting

aside the separate problem that there is no evidence regarding how long each outing

lasts on average, it simply cannot be said that a person spends a "substantial part" of

their day on something they do not at all do four to five days out of the week.

The same is true of the rest of Clarkin's activities.  Clarkin reported that she

sometimes will "drive a car, [and] shop in stores."  *Id.* at PageID.53 (AR at 32).  But

those are activities that require her to go outside of her home—and, as noted, she does

not do that on four to five days of her week.  Clarkin also reported occasionally

"eat[ing] out with friends," *id.*, but clarified that she only does this about once a week,

*id.* at PageID.339 (AR at 318).  She reported occasionally walking, but clarified that she

generally can only walk for about seven minutes at a time.  *Id.* at PageID.340 (AR at

319).  And while she has gone on three airline flights—once in 2023 and twice in 2024—

it cannot be said that a person spends a substantial part of their day on transferrable

pursuits by traveling three times in two years.

The ALJ did not distinctly say that Clarkin's activities of daily living "actually

contradict the claimant's symptom testimony," *Auapaau*, 2024 WL 4301378, at *3, but in

any event the record in its present form would not support the conclusion that they do.

In describing her symptoms, Clarkin did not suggest that she was *always* incapacitated

and unable to perform any activities.  She made clear that she performs activities of

daily living whenever she is having "a good day," but that whenever she is having "a

bad day," she "sleep[s] all day from fatigue and inability to walk from it and/or

dizziness."  Dkt. No. 8-1, at PageID.336 (AR at 315).  In a similar vein, she explained that

although she "tr[ies]" to go outside "daily," she in fact succeeds "2-3 x a week."  *Id.* at

PageID.338 (AR at 317).  It is not obvious how Clarkin's ability to maintain personal

care, prepare simple meals, perform basic household chores, walk, drive, shop, and eat

out with friends on her good days is at all inconsistent with her representation that she

cannot do any of those things—that she must instead simply stay in bed—on her bad

days.  *Accord Jaco*, 2025 WL 1144764, at *6 ("[T]he fact that Jaco was not *invariably*

incapacitated by her PTSD, anxiety, and depression does not discredit her testimony

that she occasionally was.").  At the least, the ALJ offered no reason to find any actual

inconsistency, and the court may not "attempt to intuit what the adjudicator may have

been thinking" in this appeal.  *Bray*, 554 F.3d at 1225.

    In his briefing, the Commissioner argues that the three lengthy airline trips

Clarkin took over a two-year period present an actual inconsistency with her symptom

testimony.  But Clarkin explained that she is better able to withstand airline travel

because travel helps to reduce her anxiety.  The ALJ offered no reason to reject that

explanation—indeed, the ALJ did not acknowledge it at all.  Nor did the ALJ explain

why traveling on three occasions in a two-year period would actually contradict

Clarkin's allegation that she regularly has "bad day[s]" in which she cannot do

anything at all.

For these reasons, the court concludes that the ALJ did not offer specific, clear and convincing reasons for rejecting Clarkin's symptom statements based on Clarkin's activities of daily living.

4.  The ALJ offered one last reason for rejecting Clarkin's symptom testimony: that Clarkin "stopped working due to a business-related group layoff rather than owing to impairment related reasons and reasons which are unrelated to her medical conditions, symptoms, and limitations."  Dkt. No. 8-1, at PageID.53 (AR at 32).

The court agrees, in principle, that the "fact that a claimant stopped work for reasons other than her impairments is a sufficient basis to discount her testimony." Dkt. No. 23, at PageID.974 (citing *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). But while the ALJ offered the *conclusion* that Clarkin stopped working for reasons other than her impairments, the ALJ offered no *reasons* to reach that conclusion.  And the administrative record does not make it obvious why one should reach that conclusion here.

To be sure, there is no question that Clarkin stopped being an employee for the last of her employers because of a group layoff in February 2022.  If the question were simply why Clarkin stopped working for that specific employer at the moment she did, the group layoff would be the correct answer.  But the proper question is not why Clarkin stopped being an employee for her last employer; it is why Clarkin stopped working altogether—that is, why she did not seek new work for a different employer.

17

Clarkin was, after all, a loan officer with extensive experience.  And she represented that she did not seek new work because her severe impairments precluded it.  Merely pointing to the group layoff does not offer a persuasive reason to reject Clarkin's representation.

Perhaps the Commissioner's suggestion (though it is no more fleshed out in the Commissioner's briefing than in the ALJ's decision) is that Clarkin should have stopped working for her last employer *before* she was laid off if her severe impairments truly were disabling.  But Clarkin addressed that issue, too.  In her hearing testimony, she explained that she had already begun to have significant cognitive challenges at work.  As she testified, she had "started to notice," months before her termination, that she was "forgetting things" and "was making mistakes at work" that were not "typical" of her.  Dkt. No. 8-1, at PageID.88 (AR at 67).  And in January 2022, Clarkin made a substantial error that negatively affected a client, and which reflected her cognitive decline.  *Id.* at PageID.88-89 (AR at 67-68).  If credited, this testimony would show that while it took her employer some time to terminate her, it had already become the case that Clarkin could not perform the duties of the job.  Granted, that testimony need not have been credited.  But the ALJ must offer reasons to reject it, and yet offered none.

*   *   *

The bottom line is that the ALJ did not offer any "specific, clear and convincing reasons" for rejecting Clarkin's symptom statements.  *Brown-Hunter*, 806 F.3d at 492-93

18

(cleaned up). And because that alone is sufficient reason to reverse the ALJ's decision and remand for further proceedings, the court declines to consider the other arguments Clarkin has made in support of her request for reversal. *See McLean v. O'Malley*, Civ. No. 23-00362, 2024 WL 1482616 at *5 (D. Haw. Apr. 5, 2024) (noting the propriety of remanding for one reason and declining to reach alternative grounds).

## CONCLUSION

For the foregoing reasons, the ALJ's decision (made on behalf of the Commissioner) is REVERSED and the case is REMANDED for further administrative proceedings consistent with this order.

IT IS SO ORDERED.

DATED: April 16, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 25-00239 MWJS-KJM, *Tracy Marie Clarkin v. Frank Bisignano*; ORDER REVERSING DECISION OF THE COMMISSIONER OF SOCIAL SECURITY AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS